spectfully dissent from the holding of the majority.

In re R.M.S., A.D.S., and D.C.S.

**State of Tennessee, Department of Children's Services**

v.

**Marcy G. Orange.**

Court of Appeals of Tennessee, Western Section, at Nashville.

July 12, 2006 Session.

Dec. 28, 2006.

Permission to Appeal Denied by Supreme Court March 5, 2007.

Irene R. Haude, Nashville, TN, for the appellant, Marcy G. Orange.

Paul G. Summers, Attorney General and Reporter, and Amy T. Master, Assistant Attorney General, Nashville, TN, for the State of Tennessee, Department of Children's Services.

## OPINION

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

This is a termination of parental rights case. The three children involved in this action lived with their mother and the mother's boyfriend. The oldest child re-ported to authorities that the mother's boyfriend had sexually abused her. The State was notified of the allegations, and the mother was ordered to keep the children away from the boyfriend. The mother, however, did not believe her daughter's allegations of abuse, and the boyfriend continued to live with her and the children. Consequently, the children were removed from the mother's home and placed in protective custody. While in State custody, all three children underwent extensive counseling. Eventually, all three reported to their counselors a variety of serious acts of abuse by the mother's boyfriend and by the mother as well. The mother made only minimal attempts to fulfill the requirements of the children's permanency plans and continued to live with the boyfriend. The State filed the instant petition to terminate the mother's parental rights on the grounds of abandonment, failure to comply with the permanency plans, and persistent conditions which led to the children's removal. After a five-day trial, the trial court granted the State's petition on all grounds. The mother now appeals. We affirm, finding that clear and convincing evidence establishes grounds for termination, and that terminating the mother's rights is in the children's best interest.

## I. FACTS AND PROCEDURAL HISTORY

This is a chilling case of sexual abuse. Respondent/Appellant Marcy G. Orange ("Mother") is the biological mother of the three children involved in this action, R.M.S. ("Daughter R"), a daughter born November 4, 1992; A.D.S. ("Daughter A"), a daughter born January 27, 1996; and D.C.S. ("Son D"), a son born January 30, 1998. Mother and the children's biological father were married when each of the children were born. They divorced, however, in January 2000 because the biological father had physically abused Mother

and the children. Mother received custody of the children. After Mother separated from the children's biological father, she and the children moved in with Mother's new boyfriend, Mitchell Pozezinski ("Pozezinski"), in a duplex in Joelton in Davidson County, Tennessee. The parental rights of the children's biological father are not at issue in this appeal.

In July 2001, Mother enlisted in the armed services, and the children were placed in the custody of their maternal grandmother ("Grandmother"). Grandmother was unable to deal with the needs of the youngest child, Son D, so she wrote Mother's commanding officer. As a result, Mother was recalled from the military. Mother left the armed services in October 2001, and she was formally discharged in December 2001. When she returned from duty, Mother moved back in with Pozezinski in the duplex in Joelton.

In April 2002, Mother and Pozezinski moved to a three-bedroom, single-wide trailer on Isaac Clifton road in Chapmansboro, Tennessee, Cheatham County. Around that same time, Mother regained custody of the children, and they moved into the trailer with Mother and Pozezinski. The trailer was small, and most rooms had no door, only a sheet or a curtain in the doorway. The two girls shared a bedroom, and Mother and Pozezinski slept in the living room area. The girls' bedroom was separated from the rest of the living area by a curtain, and the bathroom doorway was covered by a sheet. At the time the family moved into the trailer, Daughter R was nine years old, Daughter A was six years old, and Son D was four years old.

In October 2002, Daughter R, by then who was almost ten years old, claimed to school authorities that she was raped at school after cheerleading practice. Petitioner/Appellee State of Tennessee, Department of Children's Services ("DCS"), was notified of her allegations. In response, DCS put into effect a Plan of Action, which was signed by Mother and DCS case manager Melanie Duncan. The plan required that Daughter R be assessed for sexual abuse, that she receive counseling from licensed psychologist Janie Berryman ("Dr. Berryman"), and that she obtain a medical examination to determine if there were any physical signs of abuse.

Police lieutenant Floyd Duncan ("Lieutenant Duncan") investigated the matter.[1] Both he and Dr. Berryman interviewed Daughter R. Based on these interviews with the child, both Dr. Berryman and Lieutenant Duncan determined that Daughter R's allegation of rape on the school premises was not credible. Consequently, Lieutenant Duncan re-interviewed Daughter R, apparently on October 23, 2002. She admitted that her story of a rape at school was not true, but disclosed that she had been victimized by someone in her home. Daughter R was reluctant to tell the abuser's identity, but finally told Lieutenant Duncan that she had been raped by Mother's boyfriend, Pozezinski. Daughter R described to Lieutenant Duncan some of Pozezinski's acts of abuse. She said that he penetrated her, sometimes anally, using water or cooking oil as a lubricant. She said that he sometimes used sex toys; one was a vibrator/dildo that she called "Mr. Purple," and the other a pacifier-shaped item with a male organ instead of a nipple, which Daughter R referred to as a "pink stopper," used for anal penetration. She said that Pozezinski also forced her to perform oral sex on him. Most of the abuse occurred while they

---

1. Melanie Duncan married Lieutenant Duncan in May 2004. During the investigation of this case, they were not married, nor were they dating each other.

were living in the trailer on Isaac Clifton Road, although it apparently began when they were living in the duplex in Joelton. These acts allegedly occurred when Mother was not home. To help corroborate Daughter R's allegations, Lieutenant Duncan asked her to describe where the sex toys and cooking oil were kept in the trailer.

Lieutenant Duncan then went to the trailer and informed Mother that Daughter R had identified Pozezinski as the perpetrator of the abuse. Mother consented to permit him to search the trailer for the items Daughter R had mentioned. He found the cooking oil and the "pink stopper" where Daughter R had said they were kept. "Mr. Purple" was in a laundry basket instead of the place Daughter R had described. Mother told Lieutenant Duncan that she could not think of an instance in which Pozezinski had been left alone with the children. Mother agreed to a revised Plan of Action that required Daughter R to be medically examined at the Our Kids Clinic, and also required Mother to prevent Pozezinski from having any contact with her children, whether supervised or not.[2] In light of Mother's agreement to the terms of the revised Plan of Action, the children were left in Mother's custody at that time.

However, rather than taking Daughter R to the Our Kids clinic to be examined for sexual abuse, Mother, along with Pozezinski, took Daughter R to the office of their family doctor, where she was examined by a nurse practitioner. The nurse practitioner found no signs of forced vaginal penetration. On this basis, Mother concluded that Daughter R had lied about her claims against Pozezinski.

After that, on October 24, 2002, the DCS case worker, Melanie Duncan, received a telephone call from Mother. Daughter R and Pozezinski were on the line as well. During the telephone call, Daughter R was crying and Pozezinski was angry. Mother reported to the case worker that they had taken Daughter R to their family doctor, who found no evidence of abuse. Mother said that Pozezinski denied any abuse and told the case worker that she believed Pozezinski rather than her daughter. With Daughter R and Pozezinski on the telephone line, Mother told the case worker that Daughter R needed to tell her the truth, i.e., that Pozezinski had not sexually abused her. Mother then informed the DCS case worker that DCS would no longer be allowed to contact her children.

At that point, because Mother had disregarded the Plan and had permitted the alleged perpetrator, Pozezinski, to be in contact with the children, DCS determined that the children should be immediately taken into protective custody. On October 25, 2002, the children were finally located outside the jurisdiction at the home of Mother's mother ("Grandmother"). All three were placed in foster care, and Mother was permitted supervised visitation.

On November 5, 2002, Daughter R was examined for sexual abuse by a physician at Our Kids. She was given a physical exam and an anogenital exam, and she was also tested for sexually transmitted diseases. The anogenital exam was within the normal limits, which "neither confirm[ed] nor denie[d] the possibility of any type of sexual contact." She did not test positive for any sexually transmitted disease.

2. A copy of the plan is not in the record on appeal, but the record as a whole shows that these were the requirements of the plan.

On November 15, 2002, DCS staffed its first set of permanency plans for the children. The goal of the plans was to return the children to Mother's custody by November 15, 2003. Under the plans, Mother was required to attend non-offending parent counseling in order to learn to protect her children from further abuse, to participate in individual therapy in order to address the allegations made by Daughter R, and to attend parenting classes. Mother signed these plans but, on the advice of her attorney at that time, disagreed with the plans' requirements. The plans were approved by the court on February 2, 2003.

In November 2002, the children began counseling sessions with the psychologist, Dr. Berryman. During Dr. Berryman's initial sessions with Daughter R, she said that she was abused by a neighbor, Mr. K., as well as Pozezinski. She later said she was abused only by the neighbor and not by Pozezinski.

On December 12, 2002, the children were adjudicated dependent and neglected. The trial court found, and Mother admitted, that she violated the DCS plan of action by allowing Pozezinski access to the children because she did not believe Daughter R's allegations against him.

As the children continued to participate in counseling with Dr. Berryman, all three reported to Dr. Berryman instances during Mother's supervised visits in which she would hug them and whisper warnings to them to reveal nothing to their counselors. In the beginning of the counseling sessions, Daughter A would disclaim knowledge of any abuse. Son D refused to make any statements to Dr. Berryman because, if he did, "Mama [was] going to be mad at me." During this time, the police investigation of Daughter R's allegations of abuse against the neighbor Mr. K. indicated clearly that these allegations

were untrue. When Dr. Berryman confronted Daughter R about Mr. K., she admitted that her allegations about the neighbor were untrue, and told Dr. Berryman that Mother had instructed her to tell DCS that the neighbor, not Pozezinski, had abused her.

Meanwhile, on January 9, 2003, Son D began living with his paternal grandfather, Ronnie Thompson ("Grandfather"), and Grandfather's fiancée, Holly Rang ("Rang"). While in their home, Son D began acting out sexually. For example, while sleeping with Grandfather and Rang, Son D attempted to suck on Rang's breast through her nightgown, tried to french kiss her, and made thrusting motions on her side. He also had episodes of violent behavior, including self-destructive conduct such as beating his head on hard surfaces. Daughter A's distress manifested in the form of prolonged episodes of hysterical crying. Because of their behavior, both were evaluated and counseled by licensed counselor Sharon Huskey ("Huskey") at LifeCare Family Services ("LifeCare").

In a January 23, 2003 quarterly progress report, DCS noted that Mother had been "provided with the names and phone numbers of the providers for the services that meet the requirements of the permanency plan," but that she had not completed any of the plan requirements. The report further noted that, while Mother had an initial intake appointment for the non-offending parent program at the Rape and Sexual Abuse Center ("RASAC"), she missed the first two meetings. Because of her absences, RASAC closed her case. The DCS report also noted that Mother had been observed attempting to communicate with the children outside of the case manager's supervision, and that the youngest child, Son D, reported that, during visits, Mother would whisper in his ear that he was not to talk to DCS about

family problems. Finally, the report took note of the fact that Mother was often seen with Pozezinski, despite the allegations that he abused her children. The report commented that Pozezinski "is still in [Mother's] life. [Mother] still does not believe [Daughter R's] allegations of sexual abuse."

In light of the deleterious effects on the children of Mother's pressure not to share information with the DCS counselors, her insistence that Daughter R had lied about the abuse, and her continued relationship with the alleged perpetrator, DCS filed a motion to suspend Mother's visitation. The motion was heard by the trial court on February 4 and March 4, 2003. On March 11, 2003, the trial court entered an order granting the motion, and Mother's visitation was suspended.

Eventually, all three children came to live together in the home of Grandfather and Rang.[3] In August 2003, Grandfather died, and Rang became the primary caretaker for the children.

After Grandfather died, Rang continued to bring Son D for counseling with Huskey at LifeCare, and later all three children were counseled by Huskey. Eventually, Huskey diagnosed all three with varying degrees of post traumatic stress disorder ("PTSD"). After Mother's visitation ceased, there was improvement in some of the children's troubling behaviors, such as Daughter A's hysterical crying. The mention of Mother or Pozezinski would cause Son D to become visibly upset and engage in self-destructive behavior. Over time, all of the children disclosed numerous types of abuse. Daughter A described sexual abuse by Pozezinski, on her as well as her sister. Son D acted out sexually toward Daughter A and Rang, and he told coun-

selors that he had witnessed sexual acts between Mother and Pozezinski and that Mother had engaged in sexual behavior toward him. Daughter A and Daughter R also described often seeing sexual acts between Mother and Pozezinski. All of the children described physical abuse by Pozezinski, such as beatings with a paddle or other object.

On November 12, 2003, DCS staffed its second set of permanency plans for the children. The goal of this second set of plans was adoption. Consequently, Mother was assigned no new plan requirements. At the staffing, DCS case manager Jennifer Ballard told Mother that noncompliance with the earlier requirements could result in the termination of her parental rights. Mother signed the second set of plans, but again indicated her disagreement with them. The second set of plans was approved on May 11, 2004.

After this staffing, DCS lost contact with Mother. She told DCS that she had no telephone but could be reached through friends and letters. However, when DCS sent Mother certified mail, it was returned unclaimed. Mother would later admit that she intentionally returned some DCS letters, and that she did not give DCS her current contact information.

On December 12, 2003, DCS filed a petition to terminate Mother's parental rights as to all three children on the grounds of abandonment (Tennessee Code Annotated § 36–1–113(g)(1)), failure to comply substantially with the plans of care (Tennessee Code Annotated § 36–1–113(g)(2)), and the persistence of the conditions which led to the removal of the children (Tennessee Code Annotated § 36–1–113(g)(3)(A)). The petition also alleged that terminating

---

**3.** The initial foster parents could not handle the children because of their many difficulties and asked that they be removed.

Mother's parental rights was in the best interest of the children. DCS later filed an amended petition alleging that, "[s]ince the children originally came into custody, all three children have been in counseling and have made further disclosures" relating to sexual abuse by Pozezinski. The petition further asserted that, rather than separating herself or protecting the children from Pozezinski, Mother married him. For these reasons, DCS alleged that awarding custody of the children to Mother would pose a risk of substantial harm to them, and that terminating her parental rights was in the children's best interest.

On October 19, 2004, while the termination petition was pending, a third set of permanency plans was issued for the children. The third set of plans was not materially different from the second set, issued in November 2003. The third set also stated that the children needed to continue counseling, and that the goal of the plan was adoption. Mother did not sign the third set of plans.

## II. TRIAL

The lengthy trial in this case took place on March 28, 29, 30, 31, April 1, and April 8, 2005. Both before and during the trial, the trial court made a number of evidentiary rulings. Mother sought to introduce into evidence the results of polygraph examinations taken by Mother and Pozezinski, but the trial court refused to do so. The court also refused Mother's request that it require the children to undergo an independent medical examination at the expense of the State. Daughter R's testimony was permitted over Mother's objection that Daughter R's testimony was untrustworthy based on lies that had been told by the child. Prior to the children's testimony, the trial court did not administer the oath to them, but instead required them to acknowledge that they understood the difference between right and wrong. Moreover, the children were permitted to testify out of the presence of both Mother and Pozezinski. The trial court also refused Mother's request to continue the trial until the conclusion of Pozezinski's criminal trial on charges of child rape, so that Pozezinski could be available to testify on Mother's behalf.

### A. Testimony of Police, Counselors and Case Workers

Several witnesses testified at trial regarding the allegations of sexual abuse made by the children. At the outset, the trial court heard testimony from Lieutenant Duncan, the police detective who conducted the investigation of the allegations of sexual abuse by Daughter R. Lieutenant Duncan recounted daughter R's initial allegation that she was raped at school after cheerleading practice, and noted that his initial investigation indicated that the assault did not occur as Daughter R had described. He said that, a week later, he returned to the school and told Daughter R that his investigation showed that the story she had told him was not true, but he added that he would help her out if something had really happened. Lieutenant Duncan said that, at that point, Daughter R indicated to Lieutenant Duncan that she had been victimized by Pozezinski. At this interview, Daughter R told Lieutenant Duncan that, when Mother was not home, Pozezinski would force Daughter R to perform oral sex on him and to submit to anal sex with him, using cooking oil on his penis as a lubricant. Daughter R described to Lieutenant Duncan the purple vibrator and the "pink stopper," and told him how Pozezinski inserted these items into her body. She drew pictures of "Mr. Purple" and the "pink stopper" and told Lieutenant Duncan where they were kept and where the cooking oil was located in the house. Lieutenant Duncan told the trial court that

he was skeptical of Daughter R's allegations against Pozezinski because her first allegations turned out to be false, so he visited the home to look for corroboration. At the home, Lieutenant Duncan asked Mother to consent to a search, and asked her for some of the items Daughter R had described. Lieutenant Duncan testified that he found the oil and the stopper where Daughter R had described, but that the purple vibrator was in a laundry basket, not where Daughter R had indicated it would be.

Lieutenant Duncan stated that, after Daughter R made the accusations of sexual abuse against Pozezinski, Mother was ordered to keep the children away from him pending an investigation, and she was also ordered to take Daughter R to the Our Kids Clinic for a medical examination. Instead, Mother and Pozezinski took Daughter R to the office of their family doctor for a medical exam, rather than to the Our Kids Clinic. Subsequently, Mother and Pozezinski took all of the children to Grandmother's house, which was out of the county. Because Mother had breached the court's order and had failed to protect the children from the alleged perpetrator, Pozezinski, Lieutenant Duncan said, the trial court ordered the children removed from Mother's custody. Lieutenant Duncan then located the children at Grandmother's house and took them into protective custody.

Lieutenant Duncan interviewed Daughter R again after she was removed from Mother's custody. At the first post-removal interview, Lieutenant Duncan said, Daughter R told him that the sexual abuse she had recounted earlier was actually done by a neighbor, Mr. K. Lieutenant Duncan thereafter interviewed Mr. K., who was shocked but cooperative. Lieutenant Duncan said that his investigation indicated that the accusations against Mr.

K. were not true. Eventually, Daughter R retracted her accusations against Mr. K., and acknowledged that it was in fact Pozezinski who committed the acts of abuse against her. Thereafter, Pozezinski was charged with and arrested for child rape.

In subsequent interviews, Lieutenant Duncan testified, Daughter R gave more details about the abuse by Pozezinski. She told Lieutenant Duncan about more locations where the incidents of abuse had occurred, and said that the abuse actually began when Mother and the children were living with Pozezinski in the duplex in Joelton. Daughter R described a shed on the property where the trailer was located in which Pozezinski would force her to submit to anal sex, using water as a lubricant. Lieutenant Duncan testified that she also told him about being forced to perform oral sex on Pozezinski, and was able to describe details such as the taste of ejaculate.

Lieutenant Duncan interviewed the two younger children, but he said that initially they would give only limited responses. Eventually, however, Daughter A also reported being subjected to abuse by Pozezinski, as well as witnessing sexual interaction between Pozezinski and Daughter R.

Lieutenant Duncan testified that he was told that Daughter R had lied on a previous occasion and told students at school that she was pregnant, when she obviously was not. Therefore, at the time Daughter R made the allegations of abuse against Pozezinski, he was aware that she had lied about being pregnant, about being raped after cheerleading practice, and about Mr. K. being the perpetrator of the abuse against her. Despite this, he stated, he believed that Daughter R's allegations against Pozezinski were credible. In the course of his testimony, Lieutenant Duncan was asked how he determined whether a child's descriptions of an event indicated

that the child had experienced the event, rather than having witnessed it. Lieutenant Duncan explained that, in weighing a child's credibility, he looked for any medical findings and for corroboration of details recounted by the child. In this case, Lieutenant Duncan was not surprised that there was no medical corroboration, because that was typical for this type of abuse. However, Daughter R gave substantial details about where she was, what items were used, the time the incidents occurred, and other circumstances that were corroborated upon investigation. Furthermore, Lieutenant Duncan stated, Daughter R had information about sexual acts that was not age appropriate; he remarked that "[s]he seemed very well informed about penetration and inserting things into her body for someone who had not experienced it." In addition, Lieutenant Duncan said that when Daughter R made the earlier allegations that turned out to be untrue, her demeanor was "almost giggly and playful." However, when she began to describe the abuse by Pozezinski, her demeanor changed; she became saddened and tearful, and her posture changed to a slump. As further corroboration, Lieutenant Duncan noted that, although Mother claimed that she left the children with a caretaker when she was away, rather than leaving them with Pozezinski, the caretaker she identified denied that she kept the children. Contrary to Mother's statements, Pozezinsk did not deny that he was alone with the children from time to time.

The trial court also heard testimony from Melanie Duncan ("Ms.Duncan"), the DCS agent from child protective services who was initially assigned to the matter. Ms. Duncan accompanied Lieutenant Duncan on the first interviews with Daughter R, and she related much of the same information about those first interviews. Ms. Duncan stated that the safety plan developed by DCS required Mother to keep the children from having any contact with Pozezinski, and to take Daughter R to Our Kids clinic, because that facility specializes in victims of sexual abuse. Mother agreed to comply with the safety plan, but told Ms. Duncan that Pozezinski could not have abused Daughter R because he was never left alone with her. Contrary to her assurances to Ms. Duncan, Mother took the child to be examined by her family doctor, rather than the Our Kids Clinic. In addition, she made no effort to prevent Pozezinski from having contact with the children; indeed, Pozezinski brought Daughter R and Mother to the family physician for the medical examination.

Ms. Duncan testified about the telephone call she received from Mother after the results of Daughter R's physical examination did not confirm that the sexual abuse had occurred. Ms. Duncan said that Mother called her from Pozezinski's father's home. Mother, Pozezinski, and Daughter R were all on the line. Daughter R was crying, and Mother was urging her to confess to Ms. Duncan that she had lied about the alleged abuse by Pozezinski. In the course of the telephone call, Pozezinski talked angrily about the allegations. Ms. Duncan testified that Mother then told her that DCS would no longer be allowed to contact the children. After the telephone call, Ms. Duncan initiated the removal of the children from Mother's custody, because Mother had violated the plan by failing to protect the children from Pozezinski. Ms. Duncan testified that, at first, DCS could not locate the children. Finally, they discovered that the children were at Grandmother's house; when DCS entered the house, the children were there hiding in a closet or in a back room.

Eventually, Ms. Duncan testified, Daughter R was evaluated at Our Kids, and the exam neither confirmed nor ruled

out sexual abuse. Ms. Duncan said that she interviewed the two younger children, but that neither of them immediately made disclosures of sexual abuse.

The trial court heard expert testimony from Sharon Huskey, the counselor at LifeCare. Huskey stated that she was a crisis interventionist during the pertinent time, trained especially for dealing with persons suffering trauma, such as rape and abuse, and was licensed to make diagnoses, plan treatment, and do psychotherapy. Though Huskey eventually treated all of the children, her first experience with the family was when Grandfather brought in Son D, who was five years old at the time. Grandfather brought Son D to see Huskey based on his inappropriate sexual behavior toward Rang, such as trying to touch Rang in private areas, lick her face, and kiss her on the mouth. Son D was also generally destructive and disruptive; when he came to the LifeCare offices for therapy or treatment, they locked all of the office doors because he would run around, dump garbage cans, tear books, interrupt other sessions, knock furniture over, and swipe papers from desks. Huskey testified that she diagnosed Son D with PTSD, an extremely complicated illness that causes one who has experienced a traumatic event to store it in the brain and in effect re-experience it later. Huskey explained that PTSD can affect the part of the brain that regulates the emotions surrounding sexual behavior, and that this could cause Son D's sexualized and destructive behavior.

Huskey stated that Son D was initially reluctant to reveal information to her about the abuse, but later he began to cooperate. Son D told Huskey that Pozezinski had hit him and had made him eat dog feces because he spilled a drink. During a therapy session that included Daughter A, Huskey testified that Son D had laid Daughter A on her back, pulled her feet up, and attempted to lick her private area. When Son D was asked why he would do something like that, he told Huskey that he had seen Pozezinski do it to Mother, and Daughter A chimed in, "[y]eah, we see them all the time." Son D told Huskey that Pozezinski and Mother sometimes would "come into the room and take their clothes off and make the children watch them having sex." Son D told Huskey that Mother and Pozezinski wanted him to have sex with Daughter R, indicating genital touching and oral sex. Son D told Huskey that Mother sometimes would kiss him on the mouth, and that "she would open her mouth, yuck, and it tasted nasty." He further told Huskey that Mother wanted Pozezinski to have sex with Son D; when Pozezinski refused, Son D "was glad because that would be gross." Huskey remarked that Son D's accounts of sexual abuse "just went on and on." Rang reported to Huskey that Son D had nightmares and beat his head on the ground until he bruised it. Once she learned all of the information about the sexual abuse Son D had endured, Huskey said, she had a "very clear picture of where the trauma and the stress came from." Eventually, Son D was prescribed medication by a physician to treat his symptoms.

Huskey began treating Daughter A in February 2004, when she was eight years old. Huskey testified that Daughter A also had issues with respect to behavior, impulsivity, anger, and aggressiveness, although she was often the target of aggressive behavior from Son D or Daughter R. Daughter A told Huskey that Pozezinski hit the children with a wooden paddle until they had bruises and cuts. Daughter A described Pozezinski having her and Daughter R bend over and grab their ankles and whipping them with a strap or board "a hundred times" on their bottoms.

Daughter A's account was later corroborated separately by Daughter R.

Like the others, Daughter A exhibited inappropriate sexual behavior, such as writing a note to a boy in her class agreeing to have sex with him. Daughter A told Huskey that Mother and Pozezinski made her watch as they forced Son D to have sex with Daughter R. Huskey testified about a session with Daughter A in which she described a sexual encounter with Pozezinski:

> ... [Daughter A] was talking about that Daddy Mitchy [Pozezinski] got mad because he wouldn't fit into her and started screaming at her because his private part was too big to fit in her private part, and he lay there and screamed in her ear and made her ear hurt. And I said, And then what happened? Well, then he got up and went into [Daughter R] and he fit in [Daughter R] good, so he stopped coming to me.

> * * *

> I said and then what happened? And she said, Well, he quit screaming and he stayed on her [Daughter R] until Mama got home. What happened when Mama got home? ... Well, she got mad and made him stay outside until it was time to eat. And I said, Wow, how did you feel about that? Well, it happened all the time.

Daughter A recounted watching television in the living room area of the trailer and having to crawl over Mother and Pozezinski having sex in order to get to the VCR by the television. When she asked Mother and Pozezinski to move out of the way, Mother told her she could take her movie somewhere else. Daughter A commented to Huskey that she liked living with Rang because she had food on the table.

Huskey testified that Daughter A's coping mechanism for the abuse she had experienced was to often be compliant with the wishes of others, especially her siblings. Consequently, she was easily lead by other children. Huskey explained:

> Well, ... if you don't make waves and you don't fuss and you don't holler, then you don't get hurt as bad, and that's how she coped when she was living at home. ... [T]hat's the same type of coping mechanism. ...

After some time, Huskey also began treating Daughter R and had her attend family sessions with the younger children. By then, Daughter R was twelve years old. Huskey acknowledged that Daughter R has issues with truthfulness, but noted that lying is a typical response for a child who has been the victim of sexual abuse. Huskey testified:

> As part of a coping mechanism, when you're at home like that and you go out in school and you go out with your friends, you lie about what happens at home. ... You lie ... and then that way you won't get in trouble. And I can't tell anybody. If I tell anybody, I will be blamed, then they won't believe me. ... It's a very, very dysfunctional coping skill.

> * * *

> Lying is a form of disassociation. It's a form of separating yourself from the reality, ... so the tendency to lie about a situation is very much a protective personal coping skill.

At the same time, Huskey said, Daughter R has engaged in a violent behavior toward her siblings; Daughter R explains this conduct by saying that she is trying to get them to "listen to her. She can keep them from getting hurt."

Huskey also observed that Daughter R took on a parental role with the younger children, answering questions directed at

them and attempting to join in when Huskey corrected them. When questioned about this behavior, Daughter R explained to Huskey that she was the one who took care of the other two children, making sure that they were safe and had food to eat. Huskey commented that age twelve was a very inappropriate age to have a mothering impulse toward siblings. In addition, apparently re-enacting behavior she was required to engage in while living with Mother, Huskey said, after Daughter R moved to Rang's home, she would on occasion go into Son D's room at night to try to have sex with him. To combat this compulsion, Rang installed baby monitors in her room, and at one point Rang moved Son D into her own bedroom to sleep on a mattress on the floor.

Huskey opined that all three children had an unusually high level of knowledge of sexual activities, and not of the type that they would learn from the media such as television. She commented, "They know things I didn't know until after I was, you know, married. It's unbelievable what these children know." The sexual abuse caused them to fixate on sexual activities. All were diagnosed with PTSD.

Huskey was asked about the children's feelings about Mother. She said that the topic of Mother was difficult. When the subject of Mother arose, she stated, the children became agitated and tense; it "ruined" the therapeutic session. She said that when Mother is brought up, Son D "goes off the wall," throwing things, running out of the room, or hiding behind the couch. Huskey also related an episode which occurred when Son D was at DCS. Pozezinski happened to be in another part of the same building for a purpose unrelated to Son D, and Son D heard Pozezinski's voice. Huskey said that Son D "just heard the voice and went tearing off down the hall and crawling up under one of the

desks and started shaking and crying and beating his head, and that was just hearing the voice."

Huskey was asked about "the long-term picture" for the children, in light of the severe abuse they had endured. She said that the situation was "improving, but it's going to be a long, long process." She indicated that, in such situations, people tend to be "in and out of therapy most of their lives." She characterized their prognosis as "at the very best guarded." Huskey stated that it would "definitely" be detrimental to the children to be placed back into the home with Mother.

Dr. Berryman also testified as an expert at trial. She testified that she treated all of the children early after they were taken into protective custody, but had not been their primary therapist for some time. While she was seeing the children, she performed psycho-sexual evaluations on all of them. Dr. Berryman gauged the credibility of their disclosures by their internal consistency (consistency over time), external consistency (consistency with statements of others), emotional congruency (whether their feelings were consistent with the disclosures), and the graphic detail of their perceptions, such as taste or smell.

Dr. Berryman described her first meeting with Daughter R, in which Daughter R made graphic disclosures to her regarding the sexual abuse that had occurred. Dr. Berryman said that Daughter R told her that Pozezinski first touched her inappropriately when she was nine years old, and that it occurred in the bathroom where his bedroom was in the duplex where they lived. She said that it happened at nighttime whenever Mother was gone, and that it happened more than ten times. Dr. Berryman testified about Daughter R's description of Pozezinski's use of "Mr. Purple" and the "pink stopper" on her, and

that he placed his private part in her mouth. Pozezinski told Daughter R not to tell anyone, or she would be taken away. At that point, Daughter R was also telling Dr. Berryman that the neighbor, Mr. K., also put his private part in her mouth at his house on weekends, but that Pozezinski had touched her first. When DCS became involved, Daughter R told Mother about her disclosure of the sexual abuse, and Daughter R was under the impression that Mother believed her. Later, when Daughter R discovered that Mother did not believe her allegations, Daughter R became upset with Mother for disbelieving her.

Shortly after her first visit with Daughter R, Dr. Berryman met with Mother. In the meeting, Mother told Dr. Berryman that Daughter R had a lot of problems with lying. When Dr. Berryman asked Mother how Daughter R could have such advanced sexual information, Mother explained that Daughter R had once walked in on Mother and Pozezinski having sex and had seen them using the "pink stopper" and "Mr. Purple," both vaginally and anally. Mother said that Daughter R first saw "Mr. Purple" when Mother's brother gave it to her as a gift. To explain Daughter R calling it "Mr. Purple," Mother surmised that Daughter R must have overheard Mother calling it by that name while eavesdropping on Mother's conversations in their small doorless trailer. Mother also told Dr. Berryman that Daughter R, at age nine, had read a medical text and had heard Mother research sexually transmitted diseases. Mother said that she brought home a video from the library about the birthing process, and thought that Daughter R may have gleaned some of her sexual information from that. Mother also speculated that Daughter R may have seen a pornographic video left in their home by a babysitter. All in all, Mother explained away Daughter R's knowledge of sexual matters and would not admit to the possibility that the abuse Daughter R described actually occurred.

Dr. Berryman testified that, at Daughter R's January 9, 2003 visit, she announced to Dr. Berryman that she had lied about Pozezinski and in fact that she had lied about everything. Dr. Berryman spoke strongly to Daughter R about telling the truth, expressing to her the seriousness of her allegations. Daughter R later told Dr. Berryman that Mother had instructed her to say that she had lied about her allegations against Pozezinski. Dr. Berryman testified that she then became concerned about Mother's influence over the children. She met with Mother for the second time on January 15, 2003, and told her what Daughter R had said. At that time, Dr. Berryman explained to Mother that it was important for Daughter R's overall well-being that Mother believe her. In her testimony, Dr. Berryman remarked that, in the long term, when children have been abused and then not believed, the perceived "betrayal by the parent not believing and choosing the perpetrator over them, is almost more damage than the actual abuse was to start with. . . ." In the January 15, 2003 meeting, Dr. Berryman said, Mother said very little, and she "cried through the whole session."

Dr. Berryman said that, at other sessions with Daughter R, she again described to Dr. Berryman the same details about Pozezinski's molestation. This indicated truthfulness, Dr. Berryman explained, because children at age ten often cannot keep their stories consistent over time. Daughter R told Dr. Berryman that, at times, Pozezinski used a condom; she properly called it a "condom," and described that it was white, that it tasted like a rubber band, it had the phrase "french tickler" on the yellow package, and that it had "pink stuff" on it. Dr. Berryman had Daughter R draw pictures of the

sex toys and illustrate on other pictures to indicate where she had been touched by Pozezinski.

In March 2003, after the police had investigated Daughter R's allegations against the neighbor, Mr. K., Dr. Berryman challenged Daughter R on her allegations against Mr. K. After being confronted, Daughter R conceded that Mr. K. had never abused her, but said that her mother told her to name him as the perpetrator on the day the children were taken into custody. She said that Mother told her that, if she did not name Mr. K. as the perpetrator, she would never come home, and it would be all her fault. When Dr. Berryman emphasized to Daughter R the importance of telling the truth, she confirmed to Dr. Berryman that the allegations against Pozezinski were true. Dr. Berryman testified that, at the same time, both Daughter A and Son D were also reporting that Mother had been telling them not to reveal information. In light of this, Dr. Berryman said, she recommended that Mother be prevented from having visitation with the children, because seeing her was detrimental to their progress.

Taking into account Mother's explanations of possible sources for Daughter R's extensive sexual knowledge, and realizing that Daughter R had told lies in the past,[4] after several sessions, Dr. Berryman nevertheless credited Daughter R's allegations of sexual abuse. Dr. Berryman noted that Daughter R maintained graphic details and was able to give sensory perceptions, such as describing what a condom tasted like. She made graphic, detailed drawings of the sex toys that were used, and she had far more knowledge about sexual matters than was age appropriate. Dr. Berryman testified: "[C]hil-

dren are not very good liars. They don't hold up well over time and their stories very much fall apart. . . ." For example, the stories that Daughter R told about the perpetrator after cheerleading practice and the neighbor fell apart. In contrast, the allegations about Pozezinski had held up over time. Dr. Berryman noted that, six months after her initial disclosures, Daughter R was able to give "very credible statements" to the district attorney's office in connection with the criminal child sexual abuse charge against Pozezinski, "[a]nd those kind of statements don't hold up unless they are the truth."

Dr. Berryman also treated Son D soon after the children were taken into DCS custody. In her first meeting with Son D, he told Dr. Berryman confusing and contradictory stories, and then told her that he was "just teasing" her. In the second session, Son D told Dr. Berryman that he needed to talk about Daughter R, but said that "Mama is going to be mad at me," and that after the children were placed in foster care, "Mama told us not to tell" about anything. Soon thereafter, Rang and Grandfather described to Dr. Berryman Son D's conduct and statements in their home. For example, one night Son D pulled his pants down and indicated that Pozezinski had hurt him in his private area. Rang related that Son D had told her that Mother slapped his face and his hand, and that he had spanked Mother on her genital area because Pozezinski told him to do it. When Dr. Berryman asked Son D about what Grandfather and Rang had told her, Son D told Dr. Berryman that he could not tell her anything because Mother and Pozezinski would be mad at him.

4. Dr. Berryman said that she was aware that Daughter R had previously lied about being molested after cheerleading practice, about

Mr. K.'s abuse, about being pregnant, and about having started her period when, in fact, she had not.

Later, in September 2003, after Grandfather had passed away, Son D asked to see Dr. Berryman because "he had things he wanted to tell [her]." Son D told Dr. Berryman that, when he lived with Mother, Mother had sex with him, meaning that she touched her private part to his private part. He also told Dr. Berryman that he saw Mother and Pozezinski having sex, and that she did the same things to him. Son D told Dr. Berryman that Mother had told him that, if he told anyone, she would call the police.

When Dr. Berryman first saw Daughter A in November 2002, shortly after the children were taken into custody, Daughter A said that her understanding of why she was seeing Dr. Berryman was because Daughter R "tells lies on Daddy. That Daddy raped her." She told Dr. Berryman about an earlier incident in which a man at a nearby creek exposed his private part to her, and she told her Mother. After that, Pozezinski rewarded Daughter A with ice cream. Initially, Daughter A denied to Dr. Berryman that she had ever seen anything sexual between Mother and Pozezinski. She also stated that Mother had told her that Daughter R looked at a nasty book that belonged to Mother's friend. In the next sessions, Daughter A still refused to make disclosures, was hysterical much of the time, and blamed Daughter R and Son D for being removed from Mother's custody. Later, however, in March 2003, after Mother's visitation with the children was ended, Daughter A told Dr. Berryman that Son D had watched Mother and Pozezinski when they were naked and having sex. She described sex as "when you get on top of each other and hump each other" and French kiss on each other's private parts.

Berryman testified that, once Mother's visitation with the children had stopped, Daughter A's hysterical behavior ceased.

Daughter A told Dr. Berryman that she did not miss Mother, and indicated that she was happy about not seeing her mother because Mother beat Daughter R, slapping her face and her mouth. Daughter A explained to Dr. Berryman that she understood "beating" to mean when clothes get torn off, and indicated that it happened to Daughter R more than once. In August 2004, some time after Dr. Berryman had stopped treating Daughter A on a regular basis, Daughter A requested to see Dr. Berryman to talk with her. Dr. Berryman testified about Daughter A's disclosures at that time:

> [Daughter A] came in to see me and she told me that Mitchie [Pozezinski] got on top of me and had sex with me. His penis touched my private area, took my clothes off, skin was touching skin. He touched her on the outside and he was trying to get it in and she was describing that his private part was trying to get in her private part. She said it hurted and it happened more than one time. He told me not to tell nobody or he would kill me. Mom was at work when this occurred. She also described that she saw him and [Daughter R] and saw him and Mom having sex. I asked her, I said well why did you want to talk to me now? Why did you not tell me these things before? She said because I know you better now than I did.

Dr. Berryman believed that Daughter A had not previously disclosed this information because of Mother's coercion.

Like Huskey, Dr. Berryman opined that the children will be dealing with the aftermath of the extensive abuse on a cognitive level over a long period of time. "[I]t is not something that is just cured and then goes away. It is something that is kind of on-going."

DCS also presented testimony from Barbara Joy (Munsell) Walden ("Walden"),

the first DCS case manager assigned to the case. Walden was instrumental in developing the first permanency plan for Mother in November 2002. Walden testified that Mother was present at the staffing of the first plan, and that Walden explained to her that failure to comply with the requirements in the plan could result in termination of her parental rights.

At the staffing for the first permanency plan, Walden testified, Mother was told that she was required to attend non-offending parenting classes at RASAC. She was also informed that she was required to participate in individual therapy and family therapy, when appropriate. Walden stated that these requirements for Mother were reasonably related to the events that precipitated the children's placement in foster care. Walden testified that appointments were made for Mother to attend non-offending parenting classes, but Mother did not participate in the program. Although DCS secured funding for Mother to have individual therapy sessions with Dr. David Frensley, Mother declined to do so. Mother met with Dr. Berryman twice regarding the children.

Walden transported the children to their visitation sessions with Mother and to other appointments. Walden testified that although the children were generally pleased to see Mother at the visits, their behavior was "very disturbing." Son D frequently had severe temper tantrums, hitting, kicking, screaming, and throwing himself around the room. During one visit with Mother, Walden had to restrain Son D. Although Daughter A was not physically violent, she would "work herself into hysterics." Daughter R did not throw tantrums, but she would occasionally cry.

In January 2003, the Foster Care Review Board issued a report on Mother's compliance with the children's permanency plans. The report indicated that Mother had not complied with the plans, in that she was still involved with the alleged perpetrator and she had not otherwise performed her requirements. The report noted that Daughter R had reported that Mother had been telling her not to talk about the abuse or had been urging her to lie about it. Corroborating Daughter R's assertions, Mother was observed attempting to communicate with Daughter R without a case manager present. The evidence that Mother had attempted to influence the children not to talk about the abuse, Walden testified, led to the suspension of Mother's visitation privileges. By the time she was removed from the case, Walden said, Mother had not even begun many of the tasks required of her in the permanency plans.

Becky Short ("Short"), the DCS case manager from March 2003 until August of 2003, also testified at trial. In April 2003, Short testified, she scheduled a parenting assessment for Mother. Mother refused to attend the assessment, however, because the assigned evaluator was male. Though Short's attempt to find a female evaluator was unsuccessful, she said that she was unable to discuss it with Mother because Mother did not provide a contact telephone number. Short testified that both she and Mother were present at a meeting of the Foster Care Review Board on July 25, 2003. At that meeting, Mother informed the Review Board that she had no intention of fulfilling the requirements of the DCS permanency plan. Mother was told that, if she did not comply with the plan, her parental rights could be terminated. The State submitted into evidence periodic review summaries of the case completed by the Review Board, which showed that while DCS had complied with its obligations under the plan, Mother had not. The summaries indicated that Moth-

er did not complete the required tasks under the plan because she did not believe the allegations against Pozezinski.

Short stated that she mailed progress reports to Mother at the address at which the trailer was located, but that the mail was returned to her DCS office. Mother did not notify DCS that she had moved from that address. When Short was asked whether she made other attempts to make services available to Mother, she responded that she "did not have a working [telephone] number to reach [Mother]." She later conceded that, when she saw Mother at the meeting before the review board, Mother gave Short a telephone number.

The next DCS case manager assigned to this matter, Jennifer Ballard ("Ballard"), testified as well. Ballard testified that, by November 2003, Mother had not performed any of the required tasks in the initial permanency plan. Consequently, a new plan was formed with the goal of adoption. Mother was present at the staffing of the new plan, and "was very hostile during the entire staffing." Mother was again informed of the possibility that her parental rights could be terminated if she did not comply with the plan. Ballard told Mother that her failure to comply with the plan to date was the reason DCS was moving toward the goal of adoption. Though Mother was given a copy of the criteria and procedures for terminating her rights, she refused to sign the acknowledgment. Ballard noted that, in the January 2004 quarterly progress report, it was noted that Mother "failed to work the plan." As of the time of trial, Ballard testified, DCS had not been notified that Mother had completed any of the tasks required of her under the permanency plans.

Ballard testified that all certified DCS mail sent to Mother at the address for the trailer was returned unclaimed. After the permanency plan hearing in November 2003, she stated, Mother gave Ballard a P.O. Box number for Joelton, and thereafter any paperwork was sent to that address.

Ballard testified that the children's behavior continued to be difficult. While living with Rang, Son D had set fire to a car seat, stolen things from others, and threatened Rang with a knife. Daughter R continued to have angry outbursts. Ballard also acknowledged that DCS planned to keep the children together, despite the difficulties.

Ballard testified that, although Rang expressed interest in adopting the children, there was some concern about her ability to handle the considerable challenge. For example, Rang had been tardy numerous times in picking up the children from daycare. In December 2004, a meeting was held at the DCS office regarding the placement of the children. Concerns were raised about whether Rang gave the children proper structure, and Rang asserted that DCS had not provided her adequate help. There was also discussion about whether removal of Daughter R from Rang's household was necessary in order for the treatment of the other children to be effective. However, despite the difficulties, DCS wanted to keep the children placed together. At the conclusion of the meeting, Youth Villages agreed to assist with the children, and it was decided that Rang would continue to keep all of the children in her home with the support of DCS. Ballard testified that she was comfortable with the children being in Rang's custody, remarking that Rang is open to suggestions and had complied with all DCS requests. She stated that the children considered Rang as their biological grandmother, and that they enjoyed living with her. Ballard opined that "[t]hese

children are going to need counseling for a long time."

### B. Testimony of Foster Parent, Mother, Alleged Perpetrator, and Others

Rang testified at trial. She said that she had been an elementary school teacher for twenty years, and that she had lived with Grandfather for eleven years. She confirmed that when Son D initially moved into their home he was prone to stealing. Rang noted that, after visits with Mother, Son D would be very upset and very hard to handle. In the fall of 2004, he attempted to light her car seat on fire. Rang also acknowledged that Son D acted out sexually. She recounted an incident in which she walked in on Son D and Daughter A trying to have sex in the bathtub. She separated the two and spoke with them separately. When asked about the incident, Son D told Rang that Mother had sometimes tried to kiss him with an open mouth, and that she also tried to have sex with him. Rang testified that Son D complained to her about Daughter R coming into his bed at night, and Rang confirmed that one morning she found Daughter R still in his bedroom. Rang said that, early on, Daughter R exhibited violent behavior toward the other two children, though her violent behavior had stopped by the time of trial. She noted that Daughter R was prone to lying if she wanted to get something.

After Grandfather died, Rang testified, she decided to keep the children with her for the sake of their stability, because she realized that they had come to depend on her. She took all of the children for counseling at LifeCare, because they needed and wanted to be in counseling. Rang said that she intended to keep the children in therapy at LifeCare indefinitely, indicating that they would all "need counseling for many, many, many years to come." She noted that Daughter A needed special treatment for an eye that was injured prior to coming into DCS custody, and Daughter R has a heart murmur that periodically needs attention. In November 2004, Youth Villages began home visits with the family to help with the children's difficult behavior. By the time of trial, Son D was doing well academically and working through his behavioral problems. Rang testified that she was interested in adopting all three children if DCS could provide the children with special services they needed.

The State called Mother to testify as an adverse witness. In her testimony, Mother readily admitted that she and Pozezinski were still living together; at the time of trial, they were living rent-free in a residence owned by a friend. Evidence introduced at trial showed that they went through a marriage ceremony, even though Pozezinski was still married to another woman.[5] Mother said that, at the outset of the investigation, she agreed to keep Pozezinski away from her children. She later decided that she did not believe Daughter R's allegations against Pozezinski.

Mother stated emphatically that, as of the time of trial, she still "strongly" disbelieved Daughter R's allegations against Pozezinski, and that she thought Daughter R was lying about the entire matter. She commented that Daughter R could be spiteful when she did not get what she wanted. As examples, Mother recounted Daughter R's lie about being molested after a cheerleading practice, an occasion on

---

5. A marriage certificate for Mother and Pozezinski was entered into evidence. The record indicates that Pozezinski was facing biga- my charges as well as charges of child sexual abuse.

which she lied about finding a gun behind a house, necessitating a call to the police, and another occasion on which she lied about not having new shoes because she did not want to wear them. Mother said that she believed that Daughter R conjured up the story of abuse because, just a few weeks earlier, Daughter A had received positive attention when she reported a flasher, and Daughter R was jealous of that attention. Mother felt she was being punished for having her own beliefs on the matter. She testified that she and Pozezinski had taken lie detector tests regarding the allegations, and they had both passed.

When asked to explain why she thought the professional witnesses believed the allegations of sexual abuse, Mother stated, "Because they're job as a counselor is to believe the child whether it's true or not." Mother said that she instead relied on the medical exams that she characterized as showing that no abuse had occurred. She testified that she relied on the medical findings based on her own experience, because she had been sexually molested from the age of five to eleven by her brother's father.[6] Mother stated that she received therapy as a child, and it helped her to be aware of her surroundings and to teach her children the same.

Mother claimed that, when she and Pozezinski took Daughter R to their family doctor for a medical examination, she did not know that Daughter R had alleged that Pozezinski was the perpetrator. Mother said that she was not surprised that Daughter R knew about the sex toys retrieved by Lieutenant Duncan, because Daughter R saw Mother's brother give the toys to her as a gift, and when Daughter R later found "Mr. Purple" and asked what it was, Mother told her it was a toy that adults used. When Mother was asked how Daughter R knew its name, Mother said that Daughter R had overheard Mother call it "Mr. Purple" in adult conversations Mother had with her girlfriends. Mother also supposed that Daughter R could have learned what she knew about sex from a medical text that Mother had left open on the table, or that she could have viewed a pornographic video that was left at the home by a babysitter. Further, Mother speculated that Daughter R could have seen her and Pozezinski having sex and using the toys when they thought she was asleep.

Mother testified that Son D had a very bad temper, and that she had heard that his tantrums were escalating. When asked her opinion about what motivated Son D to make disclosures of sexual abuse by Pozezinski, Mother said that she had no idea. She guessed that his extensive knowledge about sexual matters could have been learned from a friend or from explicit movies. Mother thought that Daughter A might have obtained her sexual information from Daughter R and from whatever she had heard since being in state custody. Mother believed that Son D and Daughter A were lying about the incidents of sexual abuse because they had been influenced by Rang and others.

Mother acknowledged that, during the initial investigation, she told Lieutenant Duncan that she had never left her children alone with Pozezinski. She testified that she later realized that the children had been alone with him at times.

Mother acknowledged that the requirements of the permanency plans were reasonable, but said that her attorney at the

6. The record is unclear, but apparently the perpetrator was the father of Mother's half-brother or step-brother.

time objected to all of the non-offending parent and other parent classes available. Mother said that, in January 2003, she made an appointment to register for classes at one facility, but she did not go to the appointment and she made no follow-up attempts. Mother was of the opinion that she had completed individual counseling, because she attended between three and five sessions with a Dr. Worseter, a male psychologist who shared office space with Dr. Berryman. Mother testified that she had to borrow money in order to pay for the sessions. Mother felt that Dr. Worseter was not counseling her about issues that related to her children, however. She said that he counseled her on issues related to her past because "he felt like he had to do that before he could go to the present state." That did not seem like a good idea to Mother, because "the past wasn't bothering me; it was the present, being separated from my children." Mother stated that she informed DCS of her counseling sessions with Dr. Worseter. After she stopped seeing Dr. Worseter, she received no further counseling. Mother explained that it was because she did not have the money to pay for counseling, and she was not aware that DCS could set up and provide counseling for her. Mother indicated that, in June 2004, she obtained insurance, and she was waiting to hear back from her insurance company for an approved counselor. Regardless, Mother did not believe that counseling would be needed to address any physical or sexual abuse issues; it would deal only with the separation issues. Mother insisted that Pozezinski is not a danger to her children.

Mother claimed that, when DCS manager Short set up a parenting assessment for her with Dr. Frensly, she was not told that it had been scheduled, because she did not have a telephone at that time. When asked whether Mother thought that, given the circumstances, she could have benefited from some kind of parenting counseling, Mother stated, "I honestly didn't think about it."

She testified that, after her visitation was suspended, she had no further conversations with DCS workers about services that would be offered to her or advice on how to complete the permanency plan requirements. Mother acknowledged that the termination of parental rights criteria form was presented and explained to her, but that she refused to sign it.

At the time of trial, Mother was unemployed and was totally financially dependent on Pozezinski, who earned from $200 to $300 per week in cash doing unspecified work. She did, however, get a vehicle to transport her if she were to get a job. Mother said that she had applied for disability benefits because of a pinched nerve in her neck, but had not yet been approved. In 2000 or 2001, she said she earned between $15,000 and $20,000 per year waiting tables, but acknowledged that she had not been permanently employed since that time. She claimed that she had been unable to work because of her anxiety and depression, and because she had no transportation. At the time of trial, Mother was not looking for employment. Mother testified that she loves her children and she wants them returned to her custody.

Mother presented the testimony of family friends Betty Mooneyhan, Barbara Shivers and her husband, Charles Shivers, who testified that Mother and Pozezinski acted appropriately around the children, and that the children did not seem afraid of Pozezinski. Shivers asserted that Daughter R told her that she did not understand the allegations of sexual abuse she was making. Charles Shivers testified that

Daughter R was prone to telling "white lies."

Daughter R's fourth grade teacher, Donald Hampton, testified that Daughter R discussed inappropriate sexual things in class and, as a consequence, a note was sent home to the parents. Sandra Chester, a counselor at the school, confirmed Hampton's testimony and also recounted an incident in which Daughter R had told some of the students that she was pregnant. Pozezinski's mother testified that Mother was a good mother, and that the children are not afraid of either Mother or Pozezinski. Pozezinski's mother and father both testified that Daughter R is a manipulative child. Neither of Pozezinski's parents believed the allegations against him.

Pozezinski was also called to testify at trial. Because Pozezinski was facing criminal charges in his upcoming criminal trial for child sexual abuse, he asserted his Fifth Amendment right to refuse to answer questions. Mother's attorney renewed her pretrial motion requesting that the matter be continued until after Pozezinski's criminal trial so that Pozezinski could testify on Mother's behalf. That motion, however, was denied and Pozezinski gave no substantive testimony.

## C. Testimony of Children

The children testified before the trial judge in chambers. The attorneys were present for their testimony, but Mother and Pozezinski were not. Son D, who was seven years old at the time of trial, testified first. Son D said that Daughter R comes into his room at night, even though she has been told not to do so. When Daughter R comes into his room, Son D tells Rang, and Daughter R gets grounded. When asked whether Daughter R had touched him, Son D said no, but then indicated that Daughter R told him he would get in trouble if he said anything about being touched. When asked if Pozezinski had ever touched him between his legs, Son D said no and stated that he loved Mother and wanted to go back and live with Mother and Pozezinski, but he could not explain why he wanted to live with them.

Daughter A, who was nine years old at the time of trial, also testified in chambers. She said that she understood the difference between the truth and a lie, and she knew the difference between good touching and bad touching. Daughter A initially testified that Daughter R does not go into Son D's bedroom at night, but then added that Daughter R told her not to tell that she did this. She commented that Daughter R and Son D lie a lot about other people. Daughter A said that she loves Mother and would like to see her and Pozezinski, but she stated that she liked living with Rang better. She explained that, living with Rang, she has a bigger house and yard, and she goes to church. Daughter A indicated that Mother never touched her "in a bad way," but said that Pozezinski did whenever Mother was at work. She testified that Daughter R told her that Pozezinski touched her in a bad way also. Later in her testimony, Daughter A said that Pozezinski touched her in a bad way in her private area "[j]ust once" when he was drunk and she was home sick from school with the flu. When she told Mother about the incident, Mother purportedly "freaked out" and kicked Pozezinski out of the house for two days. Daughter A explained that, in another incident, she was in a bathing suit making ravioli and Daughter R and Son D were outside on a tire swing. She said that Pozezinski's penis touched her privates. Upon further questioning, Daughter A said that the inappropriate touching had happened "[j]ust twice." When she told Mother about this

second incident, Mother "did the same thing." Daughter A denied being afraid of Pozezinski.

Daughter R was twelve years old at the time of trial. She also testified in chambers.[7] At the outset, she promised that she would tell the truth during her testimony. She denied going into Son D's room at night because Rang "says that we should not be in each other's rooms." Daughter R stated that she gets along with Son D, even when he is a bad brother to her, and that she wants to live with him at Rang's house. Daughter R acknowledged that she knows the difference between "good" and "bad" touching. As an example of "good" touching, she cited hugging Son D after a basketball goal or giving him a "high-five." She described "bad" touching as when people touch in their private areas. She denied touching Son D in his private areas, but admitted to kicking her siblings when she gets mad. She did not believe they were afraid of her.

Daughter R remembered telling people about what Pozezinski did to her. Testifying in chambers, she said that she did not want to disclose details about the abuse at the time because she was going to have to tell about it in detail in the criminal case against Pozezinski the next week, and she did not want to have to explain it again. Daughter R said that, in the shed by her home, Pozezinski touched her private parts and made her touch his private parts. She said that he did this when her mother was at work at the "strip club." Daughter R remembered Pozezinski using "toys" when he was touching her private parts. She described him as a "sexual molester."

Daughter R admitted that she lied to Dr. Berryman when she told her that her neighbor, Mr. K., was the perpetrator. Daughter R said that while Mother was in the doctor's office with Daughter R, Mother told her to lie about the allegations and say that Mr. K. abused her instead of Pozezinski. Daughter R conceded that she had been in trouble for lying before, and noted that Rang punishes her when she lies.

Daughter R remembered the night DCS came to take the children into protective custody. Pozezinski had driven them to Grandmother's house. Mother told her to hide in the laundry room with the clothes. Eventually, Mother and Pozezinski were handcuffed and put in the police car.

Daughter R said that Mother and Pozezinski made her watch movies with nude people and sexual situations. She denied ever looking at a medical book at Mother's home. Daughter R said that Pozezinski hit her and Son D, using a paddle or a belt. When Son D would wet his bed, Pozezinski would rub his face in it. Daughter R said that she hated Mother and never wants to live with her because Mother does not listen to her. Her testimony concluded the evidence at trial.

### D. Trial Court Ruling

On July 8, 2005, the trial court entered an order terminating Mother's parental rights, finding that the State had presented clear and convincing evidence of abandonment for failure to provide a suitable home for the children, substantial noncompliance with the permanency plans, and the existence of persistent conditions which led to the removal of the children. *See* T.C.A. § 36–1–113(g)(1), (g)(2), & (g)(3) (2005); *see also* § 36–1–102(1)(A)(ii) (2005). The trial court further determined

---

7. Portions of R.S.'s testimony could not be transcribed. A Statement of the Evidence regarding those portions was approved by the trial court and submitted in accordance with Tennessee Rule of Appellate Procedure 24.

that termination of Mother's parental rights was in the children's best interest. In its order, the trial court found it critical that Mother continued to refuse to believe Daughter R's allegations in the face of "overwhelming indications of sexual abuse" established at trial. The court credited the testimony of Dr. Berryman, Huskey, Lieutenant Duncan, the DCS caseworkers, Daughter R, and Daughter A, and found that all of their testimony corroborated that both Daughter R and Daughter A were sexually abused. The trial court stated:

> It is ... clear from the testimony that these witnesses made the mother aware of the allegations and indications of [Daughter R's] victimization. While it is not a requirement that the mother believe the children's stories of abuse, it is required that she acknowledge and properly address the allegations. It seems that almost everyone else involved in this matter, including the Court, believe that [Daughter R] and [Daughter A] were sexually molested by [Pozezinski]. The in-court testimony and investigatory assertions of both [Daughter R] and [Daughter A] reveal a knowledge of sexual matters far beyond what children of their tender years should possess. Their graphic descriptions of sexual perversions by [Pozezinski] have convinced this Court that these encounters did occur.

The trial court further noted that Mother continued her relationship with Pozezinski, despite the earnest efforts of law enforcement, counselors and others to try to convince her that her children were being victimized. The trial court recalled Mother's testimony that, even if Pozezinski were convicted of the criminal charges of child sexual abuse, she would not believe that the abuse occurred, and she "wasn't sure" whether she would keep the children away from him. The trial court commented, "It is a sad fact that the mother has chosen Mr. Pozezinski over her own children."

On October 4, 2005, the trial court entered an amended order setting out in more detail its reasoning for the decision to terminate Mother's parental rights. *See* T.C.A. § 36-1-113(k) (2005). The trial court found that DCS "made reasonable efforts to assist [Mother] get the services and treatment identified in the permanency plans." Despite these efforts, Mother did not work toward completing the tasks required in the permanency plans because of her belief that Pozezinski was innocent and she, therefore, "did not see any benefit to engaging in counseling." At any rate, the trial court noted, Mother "is financially dependent on [Pozezinski]. If the children were returned to her care, they would still be living with [Pozezinski]." At some point, the trial court found, Mother moved and did not inform DCS of her whereabouts. It stated that, "[a]fter the visits were terminated, [Mother] gave up all pretense of working toward the completion of the tasks identified in the plans." Based on these additional findings, the trial court reiterated its decision to terminate Mother's parental rights on the grounds of persistent conditions, failure to comply with the permanency plans, and abandonment. From this order, Mother now appeals.

## III. ISSUES ON APPEAL

On appeal, Mother argues that the evidence, when viewed as a whole, does not clearly and convincingly establish grounds for terminating her parental rights. Specifically, she claims that clear and convincing evidence did not establish that she failed to comply with the permanency plans, or that DCS used reasonable efforts to reunite her with the children. She asserts that the evidence did not show that terminating her parental rights was in the

children's best interest. In addition, Mother argues that other errors made throughout the trial mandate reversal of the trial court's decision, namely, the trial court's refusal to admit into evidence the results of the polygraph tests taken by her and by Pozezinski, the trial court's admission into evidence of the allegations by Daughter R, despite her earlier lies, its failure to administer the oath to the children before their testimony, its failure to order an independent medical examination of the children at State expense, the admission into evidence of the allegations by the younger children, despite the fact that these allegations were not in the petition to terminate, the trial judge's refusal to recuse himself, and the trial judge's refusal to continue the trial because Pozezinski was unable to testify in light of his pending criminal charges.

## IV.  ANALYSIS

### A.  Background

A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Nale v. Robertson,* 871 S.W.2d 674, 678 (Tenn.1994). This right is a fundamental but not absolute right, and the State may interfere with parental rights if there is a compelling State interest. *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391, 71 L.Ed.2d 599 (1982); *Nash–Putnam,* 921 S.W.2d at 174–75. "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.,* 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996) (quoting *Santosky,* 455 U.S. at 787, 102 S.Ct. at 1412 (Rehnquist, J., dissenting)). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson,* 2 S.W.3d 180, 188 (Tenn.1999).

The Tennessee legislature has enumerated the circumstances in which the State's interest in protecting the child justifies interference with the parent's constitutionally protected right to parent the child. Under the pertinent statutes, a party seeking to terminate parental rights must first prove the existence of at least one of the statutory grounds for termination. T.C.A. § 36–1–113(c)(1) (2005); *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn.2002). Once this has been established, it must be proven that terminating the parental rights is in the child's best interest. T.C.A. § 36–1–113(c)(2) (2005); *In re A.W.,* 114 S.W.3d 541, 544 (Tenn.Ct. App.2003); *In re C.W.W.,* 37 S.W.3d 467, 475–76 (Tenn.Ct.App.2000). Because the decision to terminate parental rights affects fundamental constitutional rights, both of the required elements must be proven by clear and convincing evidence. *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002). Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn by the evidence." *Id.* at 539.

Because of the heightened burden of proof required, our customary standard of review must be adapted in termination proceedings. Under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's findings of fact are reviewed *de novo* upon the record, presuming those findings to be correct unless the evidence preponderates otherwise. T.R.A.P. 13(d). In reviewing a case involving the termination of parental rights,

we first determine whether the trial court's findings of fact are supported by a preponderance of the evidence. *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). We "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *In re Audrey S.*, 182 S.W.3d 838, 861 n. 26 (Tenn.Ct.App.2005). Thus, we "draw a distinction between specific facts and the combined weight of these facts." *Id.* As always, great weight is afforded to the trial court's determination regarding the witnesses' credibility, and such determinations will not be reversed absent clear evidence to the contrary. *See Jones*, 92 S.W.3d at 838.

## B. Grounds for Termination

In light of this standard of review, we consider Mother's argument that the evidence, as a whole, does not clearly and convincingly establish grounds for the termination of her parental rights. The trial court terminated Mother's rights based on (1) abandonment for failure to provide a suitable home, (2) failure to comply with the permanency plans, and (3) persistent conditions which led to the removal of the children. We first address the ground of persistent conditions.

Under Tennessee Code Annotated § 36–1–113(g)(3)(A), parental rights may be terminated when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions that led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36–1–113(g)(3)(A) (Supp.2004). In shorthand, this is referred to as the "persistent conditions" ground for termination, because the State must show that the conditions that led to the children's removal still exist and will not likely be remedied at an early date, and that such conditions prevent the children from safely returning home.

In this case, the children were removed from Mother's custody because she failed to protect the children from the alleged perpetrator, Pozezinski. It is undisputed that, at the time of trial, Mother was still living with Pozezinski, was financially dependent on him, and had no intention of severing her relationship with him. As the trial court noted, Mother expressed doubt about whether she would sever her relationship with Pozezinski even if he were found guilty on the criminal charges of sexually abusing her children. On this basis, the trial court concluded that the conditions which led to the children's removal still persist, and that the conditions are not likely to be remedied at an early date. Furthermore, Rang testified that she was willing to adopt the children, so long as DCS continued to help her with the children's special needs. Under these circumstances, the trial court found that continuing the children's relationship with Mother would greatly diminish the chil-

dren's chances of integration into a safe, stable, and permanent home.

On appeal, Mother argues that the trial court erred in basing its decision on its belief of "allegations of sexual abuse by a child who has proven to have lied on many occasions." She insists that Daughter R is not to be believed because there was no sign of physical abuse. She characterizes Daughter R as an "habitual liar or delusional," and claims that Daughter R "tried to influence the testimony of the siblings." Mother contends that Daughter R's allegations against Pozezinski were not credible because Pozezinski denied all wrongdoing, and there was evidence showing that the children were not afraid of him. She also claims that she was never informed that she could lose her parental rights for failing to sever her ties with Pozezinski. Thus, Mother argues, she is being deprived of her constitutional rights for refusing to believe allegations of sexual abuse which she has concluded, on a rational basis, are false.

In prior cases, this Court has recognized the dilemma posed in such a situation and has expressed concern about a requirement that the parent must either admit that abuse occurred or face termination of his or her parental rights. *See In re M.A.*, No. M2002–02701–COA–R3–JV, 2003 WL 22258175 (Tenn.Ct.App. Oct.1, 2003); *State v. R.S.*, No. M2002–00919–COA–R3–CV, 2003 WL 22098035 (Tenn.Ct.App. Sept.11, 2003). In *In re M.A.*, the mother's oldest daughter alleged that she had been sexually abused by the mother's live-in boyfriend. The mother refused to believe her daughter's allegations, and proceedings ensued in juvenile court to have the oldest daughter and her two younger siblings declared dependent and neglected and to remove them from the mother's custody. The juvenile court found that the daughter had, in fact, been abused by the mother's

boyfriend, and the children were removed from the home. *In re M.A.*, 2003 WL 22258175, at *1–*2.

The mother in *In re M.A.* had periodic visits with the children. Eventually, all three children disclosed physical abuse by the boyfriend and told counselors that they were afraid of him. DCS workers and the children's counselor tried repeatedly to convince the mother that the children's accusations against the boyfriend were credible. Although the mother did not bring the boyfriend into further contact with the children, she continued her relationship with him and made it clear that she strongly believed her boyfriend's denials of any abuse, and that she believed that her oldest daughter was lying and brainwashing the younger children. Because of this, the mother's visits with the children were ended and the State filed a petition to terminate her parental rights. *Id.* at *3.

The trial court terminated the mother's parental rights. The mother appealed, arguing that her rights were terminated simply because she believed that the allegations of abuse by her boyfriend were false. This Court disagreed with the mother's contention, noting that, despite the very substantial evidence of abuse:

> . . . [the mother] has adamantly refused to acknowledge even the possibility that the conduct described by her children occurred. She has essentially blamed [her oldest daughter] for the family separation, and [the oldest daughter] has suffered feelings of guilt for the situation. Mother has allowed all her children to suffer trauma, emotional turmoil, and pain because of their perception that she has chosen her boyfriend, of whom they are afraid, over them.

* * *

Whether or not Mother actually believes that [her boyfriend] committed the act described by [the oldest daughter] or the acts of physical violence or emotional abuse described by the other children, she could have lessened the trauma and pain suffered by her children by acknowledging their statements and their concerns about the future. Instead, she exacerbated the emotional damage to them. She has created a situation or conditions which prevent the return of her children in the near future. It is not her belief or disbelief as to the allegations against [the mother's boyfriend] that is the issue. Instead, it is her treatment of her children in the aftermath of these allegations.

*Id.* at *11. Thus, the Court in *In re M.A.* stressed that the key was not the parent's belief or disbelief of the allegations of abuse, but rather the parent's treatment of the children in the aftermath of the allegations. *Id.*

The point made by this Court in *In re M.A.* was emphasized by the trial court below, which stated that, although Mother is not required to "believe the stories of abuse, it is required that she acknowledge and properly address the allegations." We agree. Mother in this case "has adamantly refused to acknowledge even the possibility that the conduct described by her children occurred." Clinging to her continued disbelief of the allegations of abuse, Mother has neither acknowledged the harm to her children, nor even attempted to address the allegations. She has failed to comply with any of the requirements of the permanency plans, such as the attendance of non-offending parent classes and participation in other types of psychological therapy that could have been instrumental in the family's progress. She has expressed that she has no intention or desire to change her circumstances. She still lives with Pozezinski and has made no attempt to become financially independent of him in order to care for herself or her children.

Moreover, Mother's unwavering belief in Pozezinski's denials of abuse is contrary to a veritable mountain of evidence. The children's accounts, and indeed depictions, of frightful sexual perversions suffered at the hands of Pozezinski were astonishingly graphic and detailed. Mother's attempts to explain away their knowledge of such conduct as the result of viewing an illicit video or overhearing an adult conversation seem flimsy indeed, given the children's startling descriptions of details such as the taste of ejaculate, the smell of a condom, or the use of cooking oil as a lubricant for anal penetration by an object, as well as the surprising consistency of the stories told by each of these young children, separately and together.

Further, not content to simply disbelieve the abuse allegations, Mother's course of conduct throughout the proceedings has been an unremitting attack on the children she is charged with protecting. Indeed, upon learning of Daughter R's allegations against Pozezinski, Mother's first act was to have the alleged perpetrator, Pozezinski, assist her in bringing Daughter R to a physician for an examination of her genitals for signs of abuse. When the exam, not surprisingly, neither confirmed nor ruled out physical abuse, Mother proceeded to make a telephone call to DCS, with a sobbing Daughter R and an angry Pozezinski on the line, and demand that Daughter R retract her accusations of abuse against Pozezinski. Thereafter, Mother repeatedly sought to coerce all of the children into not cooperating with counselors and lying about the abuse they had seen or experienced. The linchpin of Mother's arguments to the trial court and to this

Court has been to depict all of the children as liars, with particularly harsh characterizations of Daughter R as manipulative and spiteful. As noted by Dr. Berryman in her testimony, Mother's response to the abuse allegations has probably caused more harm than the abuse itself. Her repeated attacks against her children only serve to highlight the courage that must have been required for them, and especially Daughter R, to finally report the abuse to authorities. Clearly the State has established by clear and convincing evidence that conditions persist which prevent the children's safe return to Mother at an early date. *See id.* at *10, *11.

Because we have determined that the State established this ground of persistent conditions, we need not address whether the trial court erred in concluding that the State also proved other grounds for terminating Mother's parental rights. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn.2003).

## C. Best Interest

■■■ Mother also argues that the trial court erred in finding that clear and convincing evidence showed that termination of her parental rights was in the children's best interest. She claims that her children have been doing worse, not better, while in Rang's custody, and cites Son D's testimony that he wanted to go back and live with her. We disagree. Clearly, the testimony established that the children's behavioral difficulties stemmed from the abuse they suffered in Mother's household and the coping mechanisms they developed to survive such repeated trauma. In any event, there was ample evidence that the children had improved, that they were doing well in school, and that Rang had made arrangements to adopt the children, with the assistance of DCS. It is clear that Mother has not made, and will not make, an adjustment of circumstance or conditions so as to make it safe for the children to return home, and that it would be harmful for the children to continue a relationship with Mother. Therefore, under all these circumstances and in light of all the statutory factors, we must conclude that the trial court did not err in determining that termination of Mother's rights is in the children's best interest for the reasons we have discussed. *See* T.C.A. § 36–1–113(i) (2005).

## D. Other Alleged Errors

■■■ Finally, Mother argues that the trial court made numerous evidentiary errors that would require a reversal in this case. She argues in part that the trial court erred in admitting evidence of abuse of Daughter A and Son D, because allegations of abuse against these two children were not mentioned in the termination petition. Mother cites no authority to support her position, and we find no error in the trial court permitting such clearly relevant evidence. We also find that the trial court did not commit reversible error in declining to continue the trial in light of the criminal charges against Pozezinski. Such matters are within the trial court's sound discretion, and we will not reverse on that basis absent an abuse of that discretion. *See State, Dept. of Human Servs. v. Hauck*, 872 S.W.2d 916, 919 (Tenn.Ct. App.1993). Furthermore, although Mother argues that the trial court committed error in refusing to admit into evidence the polygraph results, Mother was permitted to testify about them. Under these circumstances, any error in failing to admit the tests into evidence must be deemed harmless. The other arguments raised by Mother on appeal are without merit.

## V. CONCLUSION

In sum, we find clear and convincing evidence to support the trial court's find-

ing of grounds for the termination of Mother's parental rights, as well as its finding that such termination is in the best interest of the children. All other issues raised on appeal are either without merit or are pretermitted.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Marcy G. Orange, and her surety, for which execution may issue, if necessary.