IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 7, 2012 Session

**IN RE JARREL X. W.**

**Appeal from the Juvenile Court for Anderson County**
**No. J26919     Hon. Brandon K. Fisher, Judge**

_____

**No. E2012-00380-COA-R3-PT-DECEMBER 18, 2012**
_____

This is a termination of parental rights case in which Guardian, along with Custodial Parent, sought to terminate the parental rights of Father to the Child. Following a hearing, the trial court terminated Father's parental rights, finding that Father abandoned the Child by failing to visit and by failing to provide child support and a suitable home; that the conditions which led to removal persisted; and that termination of Father's parental rights was in the best interest of the Child. Father appeals. We affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Brandon Pelizzari, Oak Ridge, Tennessee, for the appellant, Joseph H. W., Jr.[1]

Laura S. Hash, Knoxville, Tennessee, guardian ad litem for the minor, Jarrel X. W.

Chauncey P., Knoxville, Tennessee, pro se.

---

[1]It is the policy of this court to initialize the last name of those involved in termination proceedings.

# OPINION

## I. BACKGROUND

This appeal relates to the termination of Joseph H. W., Jr.'s parental rights to Jarrel X. W.; therefore, the factual background will mostly contain information pertaining to Joseph H. W., Jr. ("Father") and Jarrel X. W. ("the Child"). The Child was born to Mary E. W. ("Mother") and Father on April 4, 2004. The Child was the only child born to Mother and Father (collectively "the Parents"). Father had three other children in addition to the Child. Likewise, Mother had two other children, a son ("Brother") and a daughter ("Sister"). The Parents provided for the Child, Brother, and Sister (collectively "the Children") and lived with Father's father ("Grandfather") and the Children in Grandfather's house.

In July 2008, the Tennessee Department of Children's Services ("TDCS") removed the Children from the Parents. The court affirmed the removal, finding that there was probable cause to believe that the Children were dependent, neglected, or abused because they had been exposed to drugs and alcohol and that the circumstances of the case relieved TDCS of expending reasonable efforts to prevent removal. The court placed the Children in TDCS custody and appointed Laura S. Hash ("Guardian") to serve as the Guardian ad Litem. In August 2008, the court released the Children from TDCS custody and awarded temporary legal and physical custody to Chauncey P. ("Custodial Parent"), who was a maternal relative. Custodial Parent resided with Ricky Smith.

The court adjudicated the Children as dependent and neglected and subsequently awarded permanent legal and physical custody to Custodial Parent and Ricky Smith (collectively "Custodians"). Father was instructed to complete an alcohol and drug assessment and follow recommendations from that assessment, demonstrate a minimum of six months of sobriety, complete a mental health assessment and follow recommendations, and demonstrate that he had a stable home, stable transportation, and sufficient income to support the Child. Pursuant to the court's order, Father was instructed to exercise his court-appointed supervised visitation through Parent Place in Knoxville, Tennessee.

On July 29, 2010, Guardian and Custodial Parent filed a petition to terminate Father's parental rights to the Child. At that time, Father was housed in the Anderson County Jail after having been convicted of promoting the manufacturing of methamphetamine and sentenced to six months in jail, followed by three years of probation. The grounds asserted for termination were abandonment for his willful failure to pay child support and visit the Child, abandonment for his failure to provide a suitable home for the Child, and the persistence of conditions that led to the Child's removal.

At the hearing held on October 7, 2011, Father testified that other than at court hearings, he had not seen the Child since the time of removal because he was unable to visit the Child pursuant to the arrangements set by the court. He could not afford the $75 registration fee that Parent Place required, and he could not travel from his residence in Clinton to Parent Place in Knoxville because he did not have transportation. He admitted that he never contacted Parent Place to arrange visitation or petitioned the court to request a modification of the visitation arrangement. He asserted that he did not know how to petition the court because he did not have an attorney. He stated that he sent Custodians text messages but complained that Custodians never responded.

Father testified that Custodians told him on multiple occasions that if he would "turn [his] rights over," he could see the Child on a regular basis. He recalled that on one such occasion, Custodians approached him outside of Hoskins Drug Store. He said that Custodians took a picture of him to give to the Child and told him that he could see the Child regularly if he agreed to the termination of his parental rights.

Father stated that he was told that in order to regain custody of the Child, he needed to find employment, complete drug rehabilitation, and find a suitable home. He admitted that he had not been employed consistently since the time of removal, that he had not completed drug rehabilitation, and that he was still living with Grandfather. He admitted that his home was not suitable for the Child. He testified that since the time of removal, he had been arrested "[m]aybe three times," once for promoting the manufacturing of methamphetamine and twice for failure to pay child support for his other children. He said that as a condition of his probation for his methamphetamine conviction, he was required to complete an alcohol and drug treatment program. He conceded that he had not yet completed the program but asserted that he had not failed any drug tests. He stated that while he and Mother were still married, they no longer lived together for financial reasons, namely she sought employment in Knoxville. He insisted that he did not intend to divorce Mother.

Relative to child support, Father admitted that he never submitted child support. He stated that other than "little side jobs," he had been unemployed since the time of removal. He recalled that he worked at a factory for two or three weeks during February 2010 and that he was finally hired in October 2010 to complete a four-month landscaping job. He was paid approximately $100 per week for landscaping. He did not use any of his salary from his landscaping job or his side jobs to pay child support for the Child. He explained that he "was trying to catch up on other child support payments" for his other children. He admitted that he was physically able to work but said that he could not work when he was "too hot" because he was epileptic. He said that he had not sought disability benefits and that he was currently seeking employment because he believed he was capable of working. He did not

provide any evidence regarding his living expenses, but he admitted that he did not submit rent to Grandfather.

Relative to the termination of Father's parental rights, Mother testified that she believed that Custodians took good care of the Child and kept the Child safe. She claimed that Custodians had asked Father "more than once" if he would agree to the termination of his parental rights. She stated that Father could not visit the Child at Parent Place because he did not have a driver's license. She said that prior to the removal of the Child, Father spent time with the Child and had a bond with the Child.

Ashley W. testified that she had been friends with Custodians for approximately ten years. She related that when Custodians first received the Children, they were not prepared. She recalled that she "was pretty active in helping them get things for the [Children], helping them get clothes and get them settled in." She believed that Custodians "did a good job getting it together" for the Children. She said that the Child was really reserved at the beginning but that he "wanted to be with [Mr. Smith] all the time." She stated that since the Child was placed with Custodians, she sees him every day. She believed that Custodians take good care of the Child and stated that she allowed Custodians to supervise her own child.

Ashley W. testified that she was with Custodians when they approached Father outside of the drug store. She recalled that Custodial Parent gave Father a ride and that Custodians spoke with Father during the drive. She said that Father asked about the Child and gave the impression that he was "comfortable with [Custodians] having the [Child] and that he was not - - there wasn't going to be any problem with it."

Custodial Parent testified that he was a small business owner. He related that he had owned a hair salon for approximately 14 years, that he worked in excess of 40 hours per week, and that he made approximately $70,000 per year. He insisted that he could afford to care for the Child. He said that he and Mr. Smith had been in a committed relationship for approximately 15 years. He denied the allegation that Mr. Smith hit him in the head with a telephone. He also denied the allegation that the Children had been touched inappropriately by either himself or Mr. Smith.

Custodial Parent stated that Mr. Smith cared for the Child while he was at work. He stated that because he owned the hair salon, he was able to leave the salon to be with the Child for important events. He said that either he or Mr. Smith took the Child to school in the morning and then retrieved the Child in the afternoon. He recalled that since 2008, he and Mr. Smith had taken the Children on several trips and vacations. He claimed that he had strong support from friends and Mr. Smith's family and that if he ever needed additional

-4-

assistance with the Child, his friends would assist him. He stated that he intended to adopt the Child and provide for him as if the Child were his own.

Custodial Parent testified that Mother asked him to care for Brother and Sister shortly after Brother's birth and that he took care of those children for approximately two and a half years until she eventually retrieved them.[2] He said that he did not meet the Child until the Children were taken into TDCS custody. He related that Kenny D. ("Grandmother") asked him to retrieve the Children from TDCS and that he and Mr. Smith applied for custody of the Children. He said that since August 2008, he and Mr. Smith have had the Children in their custody. He recalled that the Child was "very angry" when they first retrieved him from TDCS. He claimed that once the Child was in his care, the Child became a "very sweet, well-mannered, wonderful child." He stated that the Child shared a bedroom with Brother but that he was remodeling the house to create a new bedroom, which would allow each child to have their own bedroom.

Relative to the Child's lack of visitation with Father, Custodial Parent testified that the Parents were directed to schedule visitation with the Child through Parent Place. He said that Parent Place never contacted him about visitation. He related that "up until the past year," he had not spoken to Father. He recalled that when he saw Father at the drug store, he told Father to schedule visitation through Parent Place. He claimed that other than at court hearings, Father had not seen the Child since 2008. He asserted that Father had spoken to the Child "less than ten times" on the telephone. He said that the Child "wet the bed" after he spoke with the Parents on the telephone.

Relative to child support, Custodial Parent testified that he never received child support from the Parents. He recalled that in 2008, Father gave the Child a used Nintendo DS for Christmas. He stated that other than the gift in 2008, Father did not send the Child any other gifts or forms of support.

Custodial Parent testified that he and Mr. Smith allowed Grandmother to care for the Children every other weekend for several months. He said that he eventually discontinued the practice and that in 2011, the court told Grandmother that she was not allowed to contact the Children.

Relative to the Child, Brother, who was nine years old at the time of the hearing, testified that he and his siblings lived with the Parents, Grandfather, and Grandfather's girlfriend before they were taken from the home. He recalled one night in which Father "beat [Mother] up" until the Child jumped on Father's back. He said that the police came to the

---

[2]Mother denied that she took Brother to Custodial Parent.

house the night that Father hit Mother. He stated that the last time he spent the night at Grandmother's house, he found drugs under her bed. He denied ever seeing Mr. Smith get mad at Custodial Parent. He explained that at times, Mr. Smith would get frustrated with him and the Child but said that Mr. Smith would put him and the Child in "time-out." He insisted that Custodial Parents had never made him, the Child, or Sister feel uncomfortable.

Grandmother testified that she filed the petition for removal and that prior to her filing the removal petition, Mother called her "on several occasions" and told her that Father was "being violent." She confirmed that Brother found drugs under her bed but stated that the drugs belonged to Mother. She stated that once Mother completed treatment and moved back in with her, Custodial Parents refused to let her see the Children even though she made Mother leave the house when the Children were present. She claimed that the Children acted differently when they were at her house. She said that the Children were "not as closed off" at her house and that at times, they did not want to leave her house. She said that she provided clothing and shoes for the Children every year even though they were living with Custodial Parents. She also paid for school lunches every other month.

Grandmother testified that shortly after Custodians received custody of the Children, Custodial Parent called her and told her that he and Mr. Smith had "gotten into it" and that Mr. Smith "busted" his head with a telephone. When she arrived at the house, Custodial Parent was "holding a rag to his head." She recalled that the Child was present and that he seemed "a little scared."

While Grandmother admitted that Sister had a tendency to "tell stories," she testified that Sister told her about two instances in 2010 that were particularly disturbing. Sister told Grandmother that she observed Brother in bed with Mr. Smith and that she saw "movement" under the covers. Sister also said that she saw Mr. Smith put his hand "down the back of [the Child's] pants" while the Child was lying on top of Mr. Smith. Grandmother testified that she talked to Brother about Sister's allegations and that Brother told her not to say anything about what Sister observed between him and Mr. Smith because he did not want Custodial Parents to "get mad at him." She admitted that she did not inform the court of Sister's allegations because Sister had "a tendency to tell stories at times." She said that despite her reservations, she believed Sister's allegations. She admitted that she believed that Custodial Parents took good care of the Child.

Following the hearing, the court noted that legal and physical custody of the Child had been awarded to Custodians in August 2008, that Father was arrested on June 20, 2010, that Father failed to visit the Child since the time of removal, that Custodial Parent wished to adopt the Child, and that the Child had bonded with Custodians, who had a suitable home, income, and the ability and resources to adequately care for the Child. The court held that

Father abandoned the Child by failing to visit and by failing to provide support and a suitable home. Likewise, the court held that the conditions which led to removal persisted. Having found that four statutory grounds for termination existed, the court further found that termination of Father's parental rights was in the best interest of the Child.

In finding that Father failed to visit the Child, the court stated, Father "made no effort to visit during the relevant time period." Relative to Father's failure to submit child support, the court found that Father's testimony regarding his inability to provide support was not credible and stated, in pertinent part,

> [Father] specifically testified that he understood he had an obligation to pay child support [] and [that he] had been executing his child support obligation for other children during the relevant time period. From January 2009 until the date of the Petition, [Father] had employment on multiple occasions and had the ability to pay yet willfully failed to provide any portion of his income to support [the Child]. [Father] testified that he was physically able to work and that he held employment off and on[.]

Relative to Father's failure to provide a suitable home for the Child, the court "found clear and convincing evidence that [Father] abandoned [the Child] by [his] failure to provide a suitable home" because Father admitted that his home was not suitable for the Child. Lastly, the court stated, in pertinent part,

> [A]lthough [Father] appeared to be drug free and resolving his legal issues at the time of the hearing, at the time the [termination petition] was filed, he was incarcerated on a drug related charge. [This] case was abnormal in that it was tried significantly after being filed, but that under more normal circumstances, this matter would have been tried during the time period when [] Father was still incarcerated. As abuse of alcohol and drugs was the primary reason for [the Child's] removal, . . . the Petitioner proved by clear and convincing evidence that this issue continued to persist at the time the [termination petition] was filed.

This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Father as follows:

A. Whether Father abandoned the Child by failing to remit child support.

B. Whether Father abandoned the Child by failing to visit the Child.

C. Whether Father abandoned the Child by failing to provide a suitable home.

D. Whether the conditions that led to removal persisted.

E. Whether termination of Father's parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim*. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

# IV. DISCUSSION

## A. & B.

Father contends that the trial court erred in finding that he abandoned the Child by failing to remit child support and by failing to visit the Child. He concedes that he did not submit child support or visit the Child during the relevant time period. He asserts that his failure to submit child support and failure to visit was not willful. He states that he was unemployed during the relevant time period, that he did not have the money to pay the Parent Place registration fee, and that he could not travel to Knoxville from his home in Clinton. Guardian responds that Father willfully chose not to support the Child because he had other child support obligations. She contends that Father also did not take any steps to initiate visitation with the Child. She asserts that Father never contacted Parent Place to inquire about the actual cost of visitation and that he never contacted the court about the possibility of modifying his court-appointed visitation.

In terminating Father's parental rights, the court considered Father's failure to remit support and failure to visit from February 20, 2010 to June 20, 2010, the date of Father's incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv) (providing that when the parent is incarcerated at the time of the filing of the termination petition, the court must consider the four months preceding the incarceration). A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Likewise, a parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E).

This court has consistently held that the term willfulness as it applies to a party's failure to support or failure to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

Relative to Father's failure to remit support, the court found that Father's testimony was not credible. We reiterate that this court affords "great weight" to a trial court's assessment of a witness's credibility. *In re R.M.S.*, 223 S.W.3d 240, 265 (Tenn. Ct. App. 2006). Father's testimony was inconsistent and conflicting regarding the dates of his repeated incarcerations and the dates of his employment. Father admitted that while unemployed, he completed "little side jobs" but could not provide any information regarding when he completed those jobs. Additionally, he stated that he worked at a factory for two or three weeks in February 2010 but could not provide a precise time frame. The only consistent testimony Father offered on this issue was that he was aware of his child support obligation but that he never remitted child support for the Child because he was attempting to fulfill his other child support obligations with what little money he earned. With these considerations in mind, we reject Father's excuses for failing to provide child support.

This was not a case where a parent had numerous expenses but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Father never attempted to support the Child, having never paid child support and only provided one gift for the Child since the time of removal. Father made a conscious decision to remit support on behalf of his other biological children instead of the Child. This case was particularly troubling because Father did not remit any support in the relevant time period even though he admitted that he was employed for two or three weeks in February 2010. Accordingly, we conclude that there was clear and convincing evidence to establish that Father willfully failed to remit child support during the relevant time period. Thus, a statutory ground existed for termination of Father's parental rights.

Relative to Father's failure to visit the Child, Father acknowledged that he did not initiate visitation with the Child. Father asserts that he could not afford the registration fee and could not travel from Clinton to Knoxville. Father was aware of the procedure for initiating visitation but never even contacted Parent Place in an attempt to secure visitation with the Child. Accordingly, we conclude that there was clear and convincing evidence to establish that Father willfully failed to visit the Child. Thus, a second statutory ground existed for termination of Father's parental rights.

C.

Father admits that he failed to establish a suitable home for the Child but asserts that this termination ground is inapplicable because the Child was placed with Custodians, not TDCS. He notes that if the statute were applicable, Guardian failed to present any evidence

to establish that TDCS made reasonable efforts to assist him in establishing a suitable home. Guardian simply asserts that Father failed to establish a suitable home for the Child.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant abandonment statutory provision provides, in pertinent part,

> The child has been removed from the home of the [parents] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; *and* for a period of four (4) months *following the removal*, the department or agency has made reasonable efforts to assist the [parents] to establish a suitable home for the child, but that the [parents] have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added). Termination pursuant to the ground of abandonment for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after TDCS assisted that parent in his or her attempt to establish a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii). *See generally In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008) (providing that TDCS must submit clear and convincing evidence to establish that it expended reasonable efforts in assisting the parent when a termination ground based upon TDCS's efforts is implicated).

In this case, the Child was only in TDCS custody for a few weeks before he was relinquished to the legal and physical custody of Custodial Parent in August 2008. We agree with the trial court, Guardian, and Father that Father failed to provide a suitable home. However, the court's termination of Father's parental rights based upon this ground of abandonment was inappropriate when Custodial Parent was granted legal and physical custody of the Child shortly after the Child's removal. Guardian did not offer any testimony

-12-

regarding what efforts, if any, TDCS expended to assist Father in establishing a suitable home in the period that TDCS retained custody of the Child. Accordingly, we conclude that the trial court erred by relying on this statutory ground in its termination of Father's parental rights. Having already found two statutory grounds that supported termination, this conclusion does not result in the reversal of the termination of Father's parental rights.

D.

Father asserts that the trial court erred in finding that the conditions which led to removal persisted, namely his abuse of drugs and alcohol. He contends that his problem with drugs and alcohol had been resolved as evidenced by his compliance with the terms of his probation and his negative drug screens. Guardian responds that the conditions which led to removal persist, namely Father's abuse of drugs and alcohol and his inability to provide a suitable home.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. The pertinent question in a termination proceeding based upon the statutory ground of persistence of conditions is whether the parent has continued to abuse or neglect the Child. *State v. C.H.K.*, 154 S.W.3d 586, 592 (Tenn. Ct. App. 2004).

Here, the Child was removed from Father based upon a finding of dependency and neglect relative to Father's abuse of drugs and alcohol. While Father appears to have made great strides in his effort to combat his abuse of drugs and alcohol, he was incarcerated when the termination petition was filed for charges stemming from his promotion of the manufacturing of methamphetamine. While this court has acknowledged that it cannot expect perfection from parents who struggle with addictions, the evidence in the record reflects that at the time of the hearing, Father had not even attended an alcohol and drug treatment program as requested by the court. *See generally In re Abigail F. K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at \*17 (Tenn. Ct. App. Sep. 14, 2012) (acknowledging that recovery from addiction is a process that requires management through a treatment program and a commitment to refrain from the use of the addictive substance). Other conditions also prevent the Child's safe return to Father, namely Father admits that his home is unsuitable for the Child. There is little likelihood that Father intends to provide a suitable home for the Child as evidenced by the fact that he continues to reside in the same unsuitable residence that the Child resided in at the time of removal. Father has allowed the Child to languish in the custody of TDCS and Custodians while he lingered in his efforts to regain custody of the Child. Moreover, the Child has been placed with Custodians who love him, can provide for him, and wish to adopt him. Accordingly, we conclude that there was clear and convincing evidence to establish that the condition that led to removal and other conditions that prevent the Child's safe return persist, that there is little likelihood that the conditions will be remedied at any early date, and that the continuation of Father's relationship with Child will greatly diminish Child's chances of early integration into a safe, stable, and permanent home. Thus, a third statutory ground existed for termination of Father's parental rights.

E.

Having concluded that there was clear and convincing evidence supporting three of the four statutory grounds for termination, we must consider whether termination of Father's parental rights was in the best interest of the Child. Although Father has not appealed the court's best interest finding, we have reviewed the issue because of the gravity and finality that this decision will have on Father's parental rights. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010) (considering the best interest issue even though the issue was not raised on appeal). Following our review, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113. Accordingly, we affirm the trial court's termination of Father's parental rights.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Joseph H. W., Jr.


_____
JOHN W. McCLARTY, JUDGE